IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SHAHNAZ SIMON,                          *
                                        *
            Plaintiff,                  *
                                        *
      vs.                               *       Civil Action No. ADC-22-1238
                                        *
DICK'S SPORTING GOODS, INC.,            *
                                        *
            Defendant.                  *
                                        *

* * * * * * * * * * * * * * * * * * * * * * * *

## MEMORANDUM OPINION

Defendant Dick's Sporting Goods, Inc. ("Defendant" or "DSG") moves this Court for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure. ECF No. 38. Plaintiff has responded in opposition. ECF No. 39. After considering the Motion and the Response thereto (ECF Nos. 38, 39), the Court finds that no hearing is necessary.[1] Loc.R. 105.6 (D.Md. 2021). For the reasons stated herein, Defendant's Motion is GRANTED.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Shahnaz Simon is an Asian-American woman of Indian national origin. ECF No. 1-3 at ¶1. On or about May 5, 2019, Plaintiff visited the Dick's Sporting Goods store located on Baltimore National Pike in Ellicott City, Maryland to purchase a firearm. *Id.* at ¶¶3, 8. Once in the store, she made her way to the "Lodge Department" where firearms are sold. *Id.* at ¶8. Plaintiff took a position in the "Lodge Department" line and was the third customer from the front. *Id.* When it was Plaintiff's turn to be helped, Lodge Manager Patty Anderson (white female) "refused to call [her] forward to the counter to provide her service." *Id.* at ¶9. Ms. Anderson instead "glared

---

[1] On December 14, 2022, this case was referred to United States Magistrate Judge A. David Copperthite for all proceedings in accordance with 28 U.S.C. § 636 and Local Rules 301 and 302 (D.Md. 2021). ECF No.21.

angrily at the Plaintiff, pointed at her and told her while snapping her finger to 'move your [B]lack ass over!'" *Id.* Ms. Anderson proceeded to assist the two white customers in line behind Plaintiff, whom she greeted enthusiastically when they approached the counter. *Id.*

After waiting for approximately 20 minutes, Ms. Anderson motioned Plaintiff to the counter and angrily asked her "Are you Arab? Are you Black?" *Id.* at ¶10. She also made a comment about Plaintiff's hair, which she described as "like a [B]lack girl's hair." *Id.* Another employee, Jeff (white male), then arrived at the counter and both employees told Plaintiff "that they were not going to sell her a firearm[.]"[2] *Id.* at ¶¶10-11. Ms. Anderson and Jeff (collectively "the DSG employees") directed Plaintiff to "go get some training." *Id.* at ¶11. When Plaintiff requested the paperwork for the mandatory background check, Jeff "threw [the paperwork] across the counter at Plaintiff and said, 'Have you done any drugs this past year because if you have, I can tell you right now, you're not getting a gun!'" *Id.* at ¶11. Approximately 15 minutes after completing the paperwork, Ms. Anderson informed Plaintiff that "her background check came back 'in pending status[,]'" which only happens "when you are on a terrorist list!" *Id.* at ¶12. Ms. Anderson then told Plaintiff that she would call the following day "to let her know about the results of the background check" before demanding "that [she] leave the store." *Id.*

The following day, after failing to receive a phone call, Plaintiff returned to the "Lodge Department" to inquire about the status of her background check. *Id.* at ¶13. She was again met by Ms. Anderson who was assisting white customers. *Id.* Without any "justification or prior provocation," Ms. Anderson "angrily scolded to Plaintiff that her and Jeff decided that they were uncomfortable around her, and further explained that as a result, they canceled Plaintiff's

---

[2] Jeff's last name is not known. ECF No. 1-3 at ¶10. The Complaint, seemingly inadvertently, also refers to Jeff as John at one point. *Id.* at ¶11.

application . . . even though the background check was approved." *Id.* When Plaintiff subsequently requested the contact information for DSG's corporate office, Ms. Anderson responded, "I don't have to give your Arab ass anything! It's my prerogative." *Id.* Ms. Anderson also informed Plaintiff that she was "banned . . . from every Dick's in the state and told them not to sell [her] a gun!" *Id.* at ¶14.

Plaintiff visited another firearm retail outlet later the same day where she was "able to consummate the purchase of a firearm within 48 hours." *Id.* ¶15. As a result of her experience at DSG, Plaintiff "sought professional mental health treatment during which she was clinically diagnosed with anxiety, depression, and post traumatic stress disorder[.]" *Id.* at ¶16. She continues to suffer from "physical, mental, and emotional manifestations of her diagnoses" including "anxiety-induced grand mal seizures and weight loss" as well as "sleeplessness, panic, and fear." *Id.* at ¶¶16, 27.

On April 12, 2022, Plaintiff filed the instant action against DSG and Dick's-Ellicott City in the Circuit Court for Baltimore City. ECF No. 1. She asserts claims of Intentional Infliction of Emotional Distress ("IIES") (Count I), Negligence (Count II), and Negligent Hiring and Retention (Count III). ECF No. 1-3. Defendants removed the action to this Court on May 24, 2022. ECF No. 1. On June 1, 2022, Defendants filed a partial motion to dismiss for failure to state a claim. ECF No. 11.

On November 4, 2022, this Court (Chief Judge James K. Bredar presiding) granted Defendants' motion and dismissed Counts II and III.[3] ECF Nos. 16, 17. The Court first dismissed "Dick's-Ellicott City" as a Defendant as it is "not a legal entity with the capacity to be sued." ECF No. 16 at 5. This dismissal, the Court explained, resolved any questions as to the Court's diversity

---

[3] Defendants did not move to dismiss Count I in this motion. ECF Nos. 11; 16 at 5.

jurisdiction as the remaining parties, Plaintiff and DSG, are completely diverse. *Id.* at 4. Plaintiff "is a citizen of the State of Maryland" while "DSG is a Delaware corporation with its principal place of business in Pennsylvania." *Id.* at 4. The Court then dismissed Plaintiff's negligence claim because she failed to plead that DSG owed her a legal duty of care. *Id.* at 6-8. Similarly, Plaintiff's negligent hiring and retention claim was dismissed as she failed to plead that "DSG 'knew or should have known' that its employees were capable of inflicting the alleged harm" or that DSG otherwise "failed to use proper care in selecting and retaining its employees." *Id.* at 8-9.

This case was referred to me for all proceedings on December 14, 2022. ECF No. 21. Defendant filed the instant Motion for Judgment on the Pleadings on June 9, 2023. ECF No. 38. Plaintiff responded in opposition on June 19, 2023. ECF No. 39.

**DISCUSSION**

**Standard of Review**

A party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." Fed.R.Civ.P. 12(c). Motions for judgment on the pleadings are subject to the same standards as motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 474 (4th Cir. 2014) (citing *Butler v. United States,* 702 F.3d 749, 751-52 (4th Cir. 2012)). Accordingly, a district court "evaluating a motion for judgment on the pleadings must assume that the well-pleaded facts alleged in the complaint are true and must draw all reasonable factual inferences in favor of the non-moving party." *Hamilton Jewelry, LLC v. Twin City Fire Ins. Co., Inc.*, 560 F.Supp.3d 956, 961 (D.Md. 2021). When deciding motions under Rule 12(c), courts may also consider documents "attached as an exhibit to a pleading . . . so long as they are integral to the complaint and authentic." *Occupy Columbia v. Haley*, 738 F.3d 107, 116 (4th Cir. 2013). "A Rule 12(c) motion should be granted when the

4

pleadings 'fail to state any cognizable claim for relief, and the matter can, therefore, be decided as

a matter of law.'" *Hamilton Jewelry, LLC*, 560 F.Supp.3d at 961 (quoting *Rock for Life-UMBC v.*

*Hrabowski*, 594 F.Supp.2d 598, 605 (D.Md. 2009)).

**Intentional Infliction of Emotional Distress**

Plaintiff's only remaining claim in this action is for intentional infliction of emotional

distress under Maryland law. ECF No. 1-3 at ¶¶ 17-20. Her IIED count alleges:

- The DSG employees engaged in "hostile and blatant racial discrimination and malicious animus" as well as "conduct that was intentional, reckless, racist, xenophobic, and in a deliberate disregard of a high degree of probability that public humiliation, embarrassment, and emotional distress would result to the Plaintiff."
- The "Defendants' agents, servants, and employees were aware that Plaintiff was not engaged in any suspected or active criminal activity and further did not make any threatening gestures or remarks suggesting a propensity for the Plaintiff to become violent. Thus, the conduct exhibited by these Defendants and their agents, servants, and employees was racist, extreme, and outrageous and well beyond all possible bounds of decency, was atrocious, and would be considered utterly intolerable in a civilized society."
- "The conduct of Defendants and their agents, servants and employees proximately caused or contributed to the severe emotional distress of the Plaintiff, including Plaintiff's anxiety, sleeplessness, panic, fear, post-traumatic stress disorder, and other emotional manifestations of the malicious and excessive humiliation by the Defendants' agents, servants, and employees."

*Id.* at ¶¶ 17-19. Defendant argues that judgment on the pleadings is appropriate as Plaintiff has

failed to state that the DSG employees' conduct rose to the level of "extreme and outrageous" as

is required to prevail on an IIED claim. ECF No. 38-1 at 6. Alternatively, Defendant asserts that

Plaintiff has failed to allege that, as a result of her experience at DSG, she suffers from "the type

of severe distress" that "disrupt[s] her ability to function on a daily basis." *Id.* at 7-8.

*IIED Generally*

To sustain a claim for intentional infliction of emotional distress, a plaintiff must establish

that: (1) the conduct in question was intentional or reckless; (2) the conduct was extreme and

outrageous; (3) there was a causal connection between the conduct and the emotional distress; and (4) the emotional distress was severe. *Harris v. Jones*, 281 Md. 560, 566 (1977). Recovery under the theory of IIED "has been severely limited in Maryland." *Demby v. Preston Trucking Co., Inc.*, 961 F.Supp. 873, 882 (D.Md. 1997) "Maryland courts have cautioned that the tort of intentional infliction of emotional distress should be imposed sparingly, and 'its balm reserved for those wounds that are truly severe and incapable of healing themselves.'" *Solis v. Prince George's Cnty.*, 153 F.Supp.2d 793, 804 (D.Md. 2001) (quoting *Figueiredo-Torres v. Nickel*, 321 Md. 642, 653 (1991)). To successfully state an IIED claim, "[e]ach element must be pled and proved with specificity," *Arbabi v. Fred Meyers, Inc.*, 205 F.Supp.2d 462, 466 (D.Md. 2002), "and a deficiency in any element is fatal to a claim," *Waldrop v. Sci. Applications Int'l Corp.*, No. AW-10-cv-0328, 2010 WL 2773571, at *3 (D.Md. July 13, 2010) (citing *Foor v. Juvenile Serv. Admin*, 78 Md.App. 151 (1989)).

### *The Second Element—Extreme and Outrageous Conduct*

Defendant first argues that Plaintiff has failed to plausibly allege that the DSG employees' conduct was "extreme and outrageous." ECF No. 1-3. For a IIED claim to survive dismissal, a plaintiff must allege that the challenged conduct was both extreme and outrageous. *Haines v. Vogel*, 250 Md. App. 209, 230 (2021). In evaluating whether the identified conduct meets this standard, "courts should consider multiple factors, including the context in which the conduct occurred, the personality of the plaintiff and her susceptibility to emotional distress, and the relationship between the defendant and the plaintiff." *Mathis v. Goldberg*, No. DKC-12-1777, 2013 WL 524708, at *10 (D.Md. Feb. 12, 2013), *aff'd*, 538 Fed.App'x 310 (4th Cir. 2013). "It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as extreme and outrageous[.]" *Harris*, 281 Md. at 569.

6

*The Relationship Between the Parties*

In opposition to Defendant's Motion, Plaintiff asserts that the alleged conduct of the DSG employees rises to the level of "extreme and outrageous" because of the "authoritarian dynamic between the parties" and the DSG employees' "abuse of a position." ECF No. 39 at 3. Given the authority the DSG employees had, Plaintiff argues that the parties were in a unique relationship, entitling her "to a greater degree of protection from insult and outrage." *Harris*, 281 Md. at 569. I disagree.

Maryland courts have long recognized that the "extreme and outrageous" nature of conduct "may arise from [the defendant's] abuse of a position, or relation with another person, which gives [the defendant] actual or apparent authority over [the plaintiff], or power to affect his interests." *Id.* at 569 (citing *Restatement (Second) of Torts* § 46, comment e (1965)). Indeed, the Appellate Court of Maryland, then the Court of Special Appeals, explained that in the four successful IIED actions in the state, "the accused had a unique relationship with the person claiming emotional distress." *Haines*, 250 Md.App. at 231; *Harris*, 281 Md. at 569 ("In cases where the defendant is in a peculiar position to harass the plaintiff, and cause emotional distress, his conduct will be carefully scrutinized by the courts."). In determining whether such a relationship exists, courts often consider, among other things, whether "the defendant knew that the plaintiff was particularly sensitive or susceptible to emotional distress." *Hrehorovich v. Harbor Hosp. Ctr., Inc.*, 93 Md.App. 772, 800 (1992).

Here, Plaintiff argues that, as a business invitee, she had a unique relationship with the DSG employees who abused their authority and prevented her from purchasing a firearm at the Dick's-Ellicott City location. ECF No. 39 at 3-4. This relationship is, in Plaintiff's view, similar to that of an employee or a police officer as discussed in *Harris v. Jones*, 281 Md. 560 (1977) and

7

*McPherson v. Baltimore Police Department*, 494 F.Supp.3d 269, 286 (D.Md. 2020).

In *Harris v. Jones*, the Supreme Court of Maryland, then the Court of Appeals, recognized that "a plaintiff's status as an employee should entitle him to a greater degree of protection from insult and outrage than if he were a mere stranger." 281 Md. at 569 (citing *Alcorn v. Anbro Eng'g, Inc.*, 2 Cal.3d 493 (1970)). The court favorably cited *Alcorn v. Anbro Engineering, Inc.*, where the Supreme Court of California found that an "employer's conduct toward a [B]lack employee [was] extreme and outrageous" because the employer "standing in a position or relation of authority over plaintiff, aware of his susceptibility to emotional distress, . . . intentionally humiliated plaintiff, insulted his race . . ., ignored his union status, and terminated his employment, all without just cause or provocation.'" *Id.* at 569-70 (quoting *Alcorn*, 2 Cal.3d at 498-99).

Similarly, in *McPherson v. Baltimore Police Department*, this Court reasoned that the defendants' "position as law enforcement officers enhance[ed] the alleged extreme and outrageous character of their conduct[.]" 494 F.Supp.3d 269, 286 (D.Md. 2020). Police officers have, the Court explained, in particular "been held liable for extreme abuse of their position" given the "actual or apparent authority" they possess. *Id.* (quoting *Restatement (Second) of Torts*, § 46, comment e (1965)). It found that the defendant officers' alleged use of "authority as officers to falsify evidence of [the plaintiffs'] participation in a homicide, resulting in decades of wrongful imprisonment" was sufficiently "extreme and outrageous" to survive dismissal. *Id.*

Returning to the instant case, the Court first notes Plaintiff has failed to plead that the DSG employees knew that she was particularly sensitive or susceptible to emotional distress. *Kentucky Fried Chicken Nat'l Mgmt Co. v. Weathersby*, 326 Md. 663, 680 (1992) ("There is no evidence that KFC knew that [the plaintiff's] psychological makeup was other than that of any competent and industrious employee."). In fact, Plaintiff has failed to plead that her relationship with the DSG

8

employees predated her visit to the store on May 5, 2019 or extended past her visit to the store on May 6, 2019. ECF No. 1-3 at ¶¶8-15. Accordingly, far from a special or unique relationship, the Court finds that, at the time of the alleged conduct, Plaintiff and the DSG employees were strangers. *See Figueiredo-Torres*, 321 Md. at 655 ("Coming from a stranger, or even a friend, this conduct may not be outrageous; but we are not prepared to state as a matter of law that such behavior by a psychologist which takes advantage of a patient's known emotional problems is not extreme and outrageous[.]").

Plaintiff has, further, failed to plead that the DSG employees possessed authority that is comparable to that of the defendants in *Harris* and *McPherson*. While the DSG employees allegedly denied Plaintiff service at their store (and perhaps even all Maryland DSG locations), Plaintiff was able to rectify the wrongful denial "within 48 hours" as she was able to consummate the purchase from "another firearm retail outlet." ECF No. 1-3 at ¶ 15. The very limited authority of the DSG employees does not compare that of an employer (which controls an individual's livelihood) or a police officer (who can take an individual's liberty). Plaintiff's relationship with the DSG employees is also not remotely similar to the relationships in any of the successful Maryland IIED actions. *See, e.g., Faya v. Almaraz*, 329 Md. 435 (1993) (reversing dismissal when HIV-positive surgeon operated on the plaintiffs without their knowledge of his disease); *Figueiredo-Torres v. Nickel*, 321 Md. 642 (1991) (reversing dismissal when the plaintiff alleged a psychologist engaged in sexual relations with plaintiff's wife during the time he was counseling the couple). Accordingly, the Court finds that Plaintiff's status as an unknown business invitee does not entitle her "to a greater degree of protection from insult and outrage." *Harris*, 281 Md. at 569.

*The Conduct Here*

Having determined that Plaintiff is not entitled to "a greater degree of protection," the Court must next determine whether Plaintiff has sufficiently pleaded that the DSG employees' conduct was "extreme and outrageous." ECF no. 38-1 at 7. Maryland courts have explained that conduct meets the test of "outrageousness" when it "completely violate[s] human dignity" and "strike[s] to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung." *Hamilton v. Ford Motor Credit Co.*, 66 Md.App. 46, 59-60 (1986), *cert denied*, 306 Md. 118. As such, "mere insults, indignities, threats, annoyances, petty oppressions, and other trivialities," do not clear the high "extreme and outrageous" bar. *Harris*, 281 Md. at 567 (quoting *Restatement (Second) of Torts* § 46, comment d (1965)).

In *Bongam v. Action Toyota, Inc.*, the United States Court of Appeals for the Fourth Circuit held that an employee's use of a racial slur to a customer did not qualify as "extreme and outrageous" conduct. 14 Fed.Appx 275 (4th Cir. 2001). There, the plaintiff, a Black man, was denied delivery of a vehicle that he had contracted for and, when he complained, the salesperson whom he was working with uttered a racial epithet and told him: "You can go, I [re]sold this car, go anywhere you want." *Id.* at 280. The Fourth Circuit reasoned that summary judgment was proper on the plaintiff's IIED claim as, "[h]owever reprehensible we find the conduct, liability under Maryland law does not extend to 'mere insults, indignities, [or] threats." *Id.* at 283 (quoting *Harris*, 281 Md. at 567). The "single alleged utterance of the slur, standing alone is not" the Court explained "the sort of 'major outrage . . . essential to the tort.'" *Id.*

Although the case involves parties engaged in an employer/employee relationship, I also find the reasoning of *McNeal v. Montgomery County, Maryland* persuasive. No. MJG-04-2984, 2007 WL 9717797, at *1 (D.Md. March 16, 2007). There, the plaintiff's boss, among other things,

"demeaned him with her body language and facial expressions" and referred to him as "ugly [B]lack man," called him a "[B]lack mother fucker," and described his hands as "ashy." *Id.* at 2. While the Court noted that defendant's actions "may have been reprehensible," it found that the plaintiff has "by no means presented evidence adequate to permit a reasonable jury to find for him on the [IIED] claim." *Id.* at 4. As such, the Court granted summary judgment. *Id. See also Rollins v. Verizon Md., Inc.*, Civ No. RDB-09-2379, 2010 WL 4449361, at *3 (D.Md. Nov. 5, 2010) (although yelling at plaintiff in front of co-workers "may have embarrassed or upset [her], it does not constitute conduct that goes 'beyond all possible bounds of decency'"); *Waldrop v. Sci. Applications Int'l Corp.*, No. AW-10-CV-0328, 2010 WL 2773571, at *4 (D.Md. July 13, 2010) ("Making inappropriate comments regarding [the plaintiff's] national origin, requiring [the plaintiff] to complete training on the English language, and refusing to communicate with [the plaintiff] . . . [is] insufficient to support a claim for [IIED].").

Here, as in *Bongam* and *McNeal*, I find that Plaintiff has failed to plead that the alleged conduct was sufficiently extreme or outrageous to constitute IIED. While the DSG employees' alleged conduct is unprofessional, inappropriate, and reprehensible, the case law in this Court and the Maryland state courts clearly establishes that making demeaning comments about an individual's race/national origin on isolated occasions and providing poor customer service is not the sort of "major outrage . . . essential to the tort" of IIED. *Harris*, 281 Md. at 567; *Gennell v. Denny's Corp.*, 378 F.Supp.2d 551, 560-61 (D.Md. 2005) (poor customer service does not constitute "extreme and outrageous" conduct). Considering the parties' relationship (or lack thereof) and the DGS employees' alleged conduct, the Court finds that Plaintiff has not plausibly pleaded that the DSG employees acted in an extreme or outrageous manner as required to state an IIED claim. Accordingly, Defendant's Motion for Judgment on the Pleadings is granted.

*The Fourth Element—Severity of the Mental Distress*

Even assuming arguendo that Plaintiff has alleged that the DSG employees' conduct was "extreme and outrageous," the Court would still find that judgment on the pleadings is appropriate as Plaintiff has failed to plausibly plead the fourth element of an IIED claim—that she suffered *extreme emotional distress* as a result of the encounter. ECF No. 38-1 at 7-8. "Severe distress is that which 'no reasonable man could be expected to endure.'" *Takacs v. Fiore*, 473 F.Supp.2d 647, 652 (D.Md. 2007) (quoting *Harris*, 281 Md. at 571). A plaintiff reaches this threshold when the "emotional distress is so severe as to have disrupted her ability to function on a daily basis." *Bryant v. Better Bus. Bureau of Greater Md., Inc.*, 923 F.Supp. 720, 751 (D.Md. 1996). The "severe distress" standard is a "high burden." *Manikhi v. Mass Transit Admin.*, 360 Md. 333, 368 (2000).

As with the other elements of an IIED claim, a plaintiff must plead with particularity the severe and substantial emotional distress element. *See Hunter v. Snee*, No. ADC-21-402, 2022 WL 204930, at *7 (D.Md. Jan. 24, 2022). In *Manikhi v. Mass Transit Administration*, the court dismissed an IIED claim because the amended complaint did not "state with reasonable certainty the nature, intensity, or duration of the alleged emotional injury." 360 Md. at 370. For example, the plaintiff did not "state whether the medical treatment that she was forced to seek was of a psychological or physical nature, how long the treatment lasted, whether it was successful or is still continuing, whether it was periodic or intensive, and so forth." *Id.* Similarly, in *Takacs v. Fiore*, this Court found that while the plaintiff alleged "debilitating conditions, including 'severe depression, anxiety, sleeplessness, headaches and [being] sick to her stomach,' she [did] not allege that she ha[d] been unable to function on a daily basis, even if her functioning is presumably affected by her psychological and physical distress." 473 F.Supp.2d at 652. The Court explained that the plaintiff could not "prevent dismissal of her claim" by pleading that she "suffered a

12

severely disabling emotional response" as this is simply a "legal conclusion." *Id.*

Here, as in *Manikhi* and *Takacs*, the Court finds that Plaintiff has failed to plead with particularity that she suffered the type of severe and substantial emotional distress necessary to sustain an IIED claim. While Plaintiff alleges in her Complaint that she has been diagnosed "with anxiety, depression, and post traumatic stress disorder" and suffers from anxiety-induced grand mal seizures, weight loss, sleeplessness, panic, and fear, she does not allege that these conditions have prevented or will prevent her from functioning on a daily basis. ECF No. 1-3 at ¶¶16, 19. In fact, Plaintiff has failed to state any information relating to the nature, intensity, or duration of her alleged injuries. *Manikhi*, 360 Md. at 370. Accordingly, the Court finds that judgment on the pleadings is appropriate on this ground as well.

## CONCLUSION

For the reasons set forth in this Memorandum Opinion, Defendant's Motion for Judgment on the Pleadings (ECF No. 38) is GRANTED. A separate Order will follow.

Date: 18 July 2023

A. David Copperthite
United States Magistrate Judge

13